**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**


UNITED STATES OF AMERICA          . CRIMINAL NO.  15-10148-LTS
                                  .
          V.                      . BOSTON, MASSACHUSETTS
                                  . JUNE 26, 2015
DAVID JONES, KAREEM BERRY         .
 AARON BLOUDSON, JORGE CEPEDA     .
  DEARRON CURETON, FRANKIE FINKLEA .
   and RASHEED MARSMAN            .
      Defendants                  .
. . . . . . . . . . . . . . . . .


             **PARTIAL** TRANSCRIPT OF DETENTION HEARING
              (TESTIMONY OF DET. GREGORY BROWN ONLY)
             BEFORE THE HONORABLE MARIANNE B. BOWLER
                 UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For the Government:

UNITED STATES ATTORNEY'S OFFICE
Emily O. Cummings, Esq.
Michael J. Crowley, Esq.
J. Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
617-748-3120
emily.cummings@usdoj.gov
Michael.crowley@usdoj.gov


For defendant David Jones:

BOURBEAU AND BONILLA, LLP
Michael C. Bourbeau, Esq.
LLP One Commercial Street, Unit
One Boston, MA 02109
617-350-6565
mike@lawgenie.com


*MARYANN V. YOUNG*
**Certified Court Transcriber**
**Wrentham, MA  02093**
**(508) 384-2003**

For defendant Berry:

J.W. CARNEY, JR.& ASSOCIATES
Samir Zaganjori, Esq.
20 Park Plaza, Suite 1405
Boston, MA 02116
617-933-0350
szaganjori@carneydefense.com

For Defendant Bloudson:

SHEA & LAROCQUE
Mark W. Shea, Esq.
929 Massachusetts Avenue, Suite 103
Cambridge, MA 02139
617-577-8722
markwshea@gmail.com

For Defendant Cepeda:

SHAPIRO, WEISSBERG & GARIN
Jonathan Shapiro, Esq.
90 Canal Street, Suite 500
Boston, MA 02114-2022
617-742-5800
jshapiro@sswg.com

For Defendant Cureton:

ROPES & GRAY LLP
Aaron Katz, Esq.
Emily Honig, Esq.
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
617-951-7281
jlevy@ropesgray.com

For Defendant Finklea:

Paul J. Garrity, Esq.
14 Londonderry Road
Londonderry, NH 03053
603-434-4106
garritylaw@myfairpoint.net

For Defendant Marsman:

NATOLA ASSOCIATES, LLC
Michael F. Natola, Esq.
175 Andover Street, Suite 205
Danvers, MA 01923
978-739-9300
MNatola@NatolaAssociates.com

Court Reporter:

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

*MARYANN V. YOUNG*
**Certified Court Transcriber**
**Wrentham, MA  02093**
**(508) 384-2003**

4

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Gregory Brown | 6 | | | |
| By Atty. Shea | | 19 | | |
| By Atty. Shapiro | | 32 | | |

EXHIBITS

None

1   (Case called into session)

2   (12:25:23 PM)

3          THE CLERK:  The District of Massachusetts is now

4   in session.  The Honorable Marianne B. Bowler presiding.

5   Today is Friday, June 26, 2015 in the case U.S. v. Jones

6   et al, Civil Action 15-10148 will now be heard.

7          Counsel; please identify yourselves for the

8   record.

9          MR. CROWLEY:  Good afternoon, Your Honor,

10  Michael Crowley and Emily Cummings on behalf of the United

11  States.

12         THE COURT:  Thank you.

13         MR. GARRITY:  Good afternoon, Your Honor,

14  Michael Natola.

15         THE COURT:  Well I'd like you in the order in

16  which you're named so.

17         MR. GARRITY:  I'm sorry.  I'll sit down, cause

18  I'm last.

19         THE COURT:  The last shall be first.

20         MR. NATOLA:  Not me.

21         MR. BOURBEAU:  Good afternoon, Your Honor,

22  Michael Bourbeau present with Mr. Jones who is third from

23  the end.

24         THE COURT:  So noted.

25         MR. ZAGANJORI:  Good afternoon, Your Honor, Sam

1    Zaganjori on behalf of Kareem Berry.

2            THE COURT:  Thank you, for Mr. Bloudson?

3            MR. SHEA:  Good afternoon, Your Honor, Mark Shea

4    for Mr. Bloudson.

5            THE COURT: Bloudson, sorry.  For Mr. Cepada?

6            MR. SHAPIRO:  Good afternoon, Your Honor,

7    Jonathan Shapiro for George Cepada.

8            THE COURT:  Thank you very much.  For Mr.

9    Cureton?

10           MR. KATZ:  Your Honor, Aaron Katz for Mr.

11   Cureton and my colleague, Emily Honig who may handle the

12   balance of the hearing.

13           THE COURT:  And is she on the CJA list?

14           MR. KATZ:  She is not, Your Honor.  I'm

15   supervising.  I'm standing in today on behalf of Joshua

16   Levy who's also on the matter.

17           THE COURT:  But you're on the CJA list?

18           MR. KATZ:  I am not, Mr. Levy is.  He was unable

19   to appear today for reasons that were outside of his

20   control.

21           THE COURT:  But you know, yes, but for

22   arraignment I like to have counsel of record, you know.

23           All right, Mr. Natola?

24           MR. NATOLA:  That would be me, Your Honor, for

25   Mr. Marsman.

7

1    THE COURT:  Yes and Mr. Garrity?

2    MR. GARRITY:  Good afternoon, Your Honor.

3    THE COURT:  All right, we're here for the

4    purposes for detention and arraignment.

5    ************************************************************

6    THE COURT:  All right.  Mr. Crowley?

7    MR. CROWLEY:  Your Honor, the government calls

8    Detective Gregory Brown.

9    THE COURT:  Would you please come forward and be

10   sworn.

11   WITNESS, DETECTIVE GREGORY BROWN, SWORN

12   MR. CROWLEY:  Your Honor, if I could provide to

13   the Court, I've provided to defense counsel.

14   THE COURT:  And you've provided it to counsel

15   already, all right, and Brendon you have the exhibits from

16   the last.  There's a criminal record there that's all part

17   of it.

18   MR. CROWLEY:  May I proceed, Your Honor?

19   THE COURT:  You may.

20                   DIRECT EXAMINATION

21   BY MR. CROWLEY:

22   Q    Detective Brown, can you briefly spell, state and

23   spell your name for the record?

24   A    Yes, my name is Gregory Brown, G-R-E-G-O-R-Y  B-R-O-

25   W-N.

8

1   Q    And would you please just state who you're employed

2   by and your background briefly.

3   A    I'm a detective with the Boston Police Department

4   Special Investigation Unit.  I've been assigned to the

5   Special Investigation Unit for the past eight years.

6   Prior to that I was with the gang unit for 15 years and

7   Area B2 for four and a half.

8   Q    And sir, were you involved in an investigation known

9   as the Rising Tide?

10  A    Yes, I was.

11  Q    And to streamline things, I'd like to focus your

12  attention first on a Mr. Bloudson.

13  A    Yes.

14  Q    Have you had experience with Mr. Bloudson?

15  A    I'm aware of Mr. Bloudson, yes.

16  Q    Were you aware of whether he has any gang ties?

17  A    Yes, I am.

18  Q    And what are those gang ties?

19  A    He's a member of the Columbia Point Dogs.

20  Q    And during the investigation of Rising Tide were

21  phone calls intercepted?

22  A    Yes, they were.

23  Q    And during the interception were there calls

24  intercepted involving Mr. Bloudson?

25  A    Yes.

9

1  Q    At any point were there calls intercepted involving

2  Mr. Bloudson discussing with any Columbia Point gang

3  members violence?

4  A    Yes.

5  Q    Could you describe to the Court what that was?

6  A    That was a call between him and Demetrius Williams.

7  When Demetrius Williams, someone had contacted Demetrius

8  Williams relative to a rival gang member from Orchard

9  Park.  Then present at Dorchester court, Mr. Williams

10  summonsed Mr. Bloudson as well as other Columbia Point

11  members to go to Dorchester court in an attempt to cause

12  harm to this particular person.

13  Q    And Demetrius Williams, are you aware whether he has

14  a role in Columbia Point?

15  A    Yes.

16  Q    And what is his role?

17  A    He's a member.  He run a crew with his brother Yancy

18  Williams.

19  Q    And following this call involving Mr. Blousdon, did

20  law enforcement take steps to prevent the violence?

21  A    Yes.

22  Q    What kind of steps were taken?

23  A    We saturated the area of Dorchester court with marked

24  and unmarked vehicles as well as some surveillance and

25  watched that particular person that was being targeted

1   exit the court.

2   Q    And you raised the issue with Orchard Park.  Is there

3   any kind of gang involvement between Columbia Point and

4   Orchard Park?

5   A    It's a very longstanding violent dispute between

6   Columbia Point and Orchard Park.

7   Q    And has that dispute involved acts of violence

8   generally?

9   A    Yes, it has, yes.

10  Q    Now, in addition to that, during the interception

11  period, did you intercept calls from Mr. Jones to Mr.

12  Bloudson?

13  A    Yes.

14  Q    And vice versa from Mr. Bloudson to Mr. Jones?

15  A    Yes.

16  Q    Calling your attention to October 4, 2014, on that

17  date did you, were his calls intercepted?

18  A    Yes.

19  Q    And what was discussed?

20  A    Mr. Jones called Mr. Bloudson and requested to

21  purchase 62 grams of cocaine from Mr. Bloudson.

22  Q    And did he use the term 62 Chevy?

23  A    Yes, he did.

24  Q    And what happened during that call?  Was an

25  arrangement made?

1   A    Arrangements were made.  Mr. Bloudson informed Mr.

2   Jones that he had to go to ms.'s crib (ph) and get the key

3   which is an apartment that was located in the 1900 block

4   of Dorchester Avenue.  Mr. Bloudson was observed going to

5   that location, therein shortly meet Mr. Jones at 3 Ware

6   Street in Dorchester.

7   Q    And sir, you use the term ms. (ph); is that another

8   individual that you're aware of?

9   A    Yes.

10  Q    And was Mr. Bloud, so Mr. Bloudson was surveilled

11  going to a location associated with Mr. Jones?

12  A    He was.

13  Q    And was he driving a Ford Fusion at that point?

14  A    Yes, a rented vehicle.

15  Q    And is it correct that that vehicle was rented under

16  the name Kristin Montero?

17  A    That's correct.

18  Q    And is that the individual with whom Mr. Bloudson has

19  been recently living?

20  A    Yes.

21  Q    In fact is his phone under Ms. Montero's name?

22  A    Yes, the phone is subscribed to her name.

23  Q    And following the October 4, 2014 delivery, at any

24  other point did Mr. Jones and Mr. Bloudson discuss

25  cocaine?

1    A    Two days later.

2    Q    And can you briefly describe to the Court what was

3    discussed on that day?

4    A    Mr. Jones called Mr. Bloudson and ordered the same

5    thing, that was his term.  Mr. Bloudson was again observed

6    to go to the 1900 block on Dorchester Avenue to Evan

7    Figueroa's apartment.  He did arrive in another rented

8    vehicle at 153 Norwell Street where Mr. Jones was and

9    delivered another 62 grams.

10   Q    And 153 Norwell Street, is that a location that is

11   associated with Mr. Finklea?

12   A    Yes, it is.

13   Q    Have you see other defendants at that location—

14   A    Umm.

15   Q    --or observed them electronically meeting there?

16   A    Yes.

17   Q    Did that include Mr. Cepada?

18   A    It did.  It also included a number of other guys,

19   yes.

20   Q    Could you briefly list who else?

21   A    Mr. Cureton, that's the person I do remember the

22   name.  There was guys from Framingham, Gennell Gasby (ph),

23   Annemarie Nabara (ph), a number of people that would

24   arrive at that location.

25   Q    Was Mr. Jones also identified as being at that

1  location?

2  A     Frequent presence there, yes.

3  Q     And are you aware based upon your investigation

4  including intercepted calls how that location was used?

5  A     It was used to store and distribute crack cocaine,

6  heroin, as well as marijuana.

7  Q     And on the take down date in this case was a firearm

8  seized from that location?

9  A     I believe a loaded 38 firearm was seized from that

10  location, yes.

11  Q     Now, turning to Mr. Cepada, are you aware whether Mr.

12  Cepada has any gang associations?

13  A     Yes.

14  Q     And how are you aware of that?

15  A     Through my investigation as well as my time in the

16  gang unit.

17  Q     And what association is that?

18  A     He's a member of the Columbia Point Dogs.

19         MR. SHAPIRO:  Your Honor, I object unless we

20  have some basis for that conclusion.

21         MR. CROWLEY:  Hearsay is available, Your Honor,

22  if he wants to--

23         THE COURT:  Maybe you can ask him a couple of

24  foundation questions.

25  BY MR. CROWLEY:

14

1    Q    During your time in the gang unit, did you have a

2    chance to interact with Mr. Cepada or others associated

3    with the Columbia Point Dogs?

4    A    When the times that I've been talking with Mr. Cepada

5    he was in the Henry Street area of Dorchester mainly.

6    Later he began to associate with members of the Columbia

7    Point Dogs.

8    Q    Okay, and in this case did you associate with members

9    of the Columbia Point Dogs?

10   A    Yes.

11   Q    And there was discussions about the three controlled

12   purchases?

13   A    Yes.

14   Q    Can you briefly describe for all three was there a

15   certain procedure, what was?

16   A    Yes.

17   Q    Could you just describe it to the Court?

18   A    Meet with the CW.  The CW was briefed, searched for

19   drugs and money.  The CW would then call a particular

20   number that was given, in this case to Mr. Cepada which

21   identified himself as Genito (ph) to the CW.  A quantity

22   of drugs were ordered.  A price was agreed upon and a

23   location where the drugs would be purchased, would be

24   done, then the CW would be escorted to that area where

25   they would meet with Mr. Cepeda.

15

1   Q    And where did those meetings take place?

2   A    Four Beale Street in Dorchester.

3   Q    And was--

4        THE COURT:  What street?

5   A    Beale.

6        THE COURT: B-I-L-L?

7        THE WITNESS:  B-E-A-L-E.

8   BY MR. CROWLEY:

9   Q    And was Mr. Jones also involved in at least one of

10  those?

11  A    Yes.

12  Q    And at each point was crack, excuse me, cocaine base

13  purchased?

14  A    Yes.

15  Q    And was the total amount purchased from Mr. Cepada

16  approximately 63 grams of cocaine base?

17  A    That's correct.

18        MR. SHAPIRO:   Objection to that conclusion.

19        THE COURT:  It's a leading question, Mr.

20  Crowley?

21  BY MR. CROWLEY:

22  Q    How much coc, approximately how much crack cocaine

23  was purchased during those three controlled buys involving

24  Mr. Cepada?

25        MR. SHAPIRO:  Again, I object to lumping it

1    together.  If there is a specific amount--

2              MR. CROWLEY:  Your Honor, he can cross examine.

3              MR. SHAPIRO:  --for each time he should testify

4    to.

5              THE COURT:  You have to learn not to interrupt,

6    Mr. Crowley.  Try and break it up.

7    BY MR. CROWLEY:

8    Q    Looking at the last page of the attachment--

9    A    Yes, sir.

10   Q    --is this a controlled purchase diagram which breaks

11   down controlled purchases during the investigation in this

12   case?

13   A    Yes, it is.

14   Q    And following your attention to July 16, 2013, that

15   identifies a deal involving Mr. Cepada; is that correct?

16   A    That's correct.

17   Q    And who else was involved in that deal?

18   A    Kareem Berry and David Jones.

19   Q    And during that deal how much crack cocaine was

20   recovered?

21   A    28.2 grams.

22   Q    And then on August 6, 2013, was that another deal

23   involving Mr. Cepada?

24   A    Yes, yes, sir.

25   Q    And again at 4 Beale Street?

1  A     Yes.

2  Q     And approximately how much crack cocaine was

3  recovered on that date?

4  A     15.3 grams.

5  Q     And was there also a small amount of heroin?

6  A     Yes, Mr. Jones gave the CW a small sample of heroin.

7  Q     And calling your attention to June 3, 2014, was that

8  another deal involving Mr. Cepada?

9  A     Yes.

10  Q     And how much cocaine, crack cocaine was involved in

11  that deal?

12  A     Is that June 3rd?

13  Q     June 3, 2014.

14  A     Yes, sir.

15  Q     And during the investigation was a cooperating

16  witness used to conduct these?

17          THE COURT:  Did we get an answer to that

18  question?

19          MR. CROWLEY:  He said, yes, sir.

20          THE COURT:  Yes.

21  BY MR. CROWLEY:

22  Q     Was a cooperating witness used to conduct these

23  controlled purchases?

24  A     Yes.

25  Q     At any point, could you describe what involvement Mr.

1   Cepada had with the cooperating witness whether he

2   provided him or her with information or phone numbers, et

3   cetera?

4   A    Mr. Cepada provided the CW with his phone number.

5   Q    And was that in order to purchase drugs?

6   A    Yes.

7           MR. SHAPIRO:  Objection, conclusion.

8           THE COURT:  Try not to lead on direct.

9           MR. CROWLEY:  The rules of evidence don't apply

10  in detention hearings.

11          THE COURT:  Well there's a certain procedure.

12  BY MR. CROWLEY:

13  Q    Why did Mr. Cepada provide, based on your

14  communications with cooperating witness--

15          THE COURT:  I don't think it's that the rules of

16  evidence don't apply.  Hearsay is permitted.  To say the

17  rules of evidence don't apply is quite a sweeping

18  statement.

19  BY MR. CROWLEY:

20  Q    On that event did you speak with the cooperating

21  witness?

22  A    I did.

23  Q    Did the cooperating witness identify why Mr. Cepada

24  provided him or her with the phone number?

25  A    The CW stated that Mr. Cepada gave it, the phone

1  number and instructed the CW to call him instead of

2  dealing with the other people.

3  Q    And following that, did the three transactions we've

4  discussed take place?

5  A    Yes.

6  Q    No further questions, Your Honor.

7           THE COURT:  Cross examination?

8           MR. SHEA:  I can go last this time if you want

9  me to.

10          THE COURT:  Well it should be in the order in

11 which--

12          MR. SHEA:  Yeah, okay.  I'll get beat up when I

13 leave the building.

14          MS. CUMMINGS:  By defense counsel.

15                CROSS EXAMINATION

16 BY MR. SHEA:

17 Q    Good afternoon, detective.

18 A    Good afternoon, sir.

19 Q    So this chart of controlled purchases, do you have

20 that in front of you?

21 A    I do.

22 Q    Do you see any with Mr. Bloudson's name on there?

23 A    Mr. Bloudson's name doesn't appear on that chart,

24 sir.

25 Q    Okay so he didn't make any, he had, how many CWs did

20

1   you have?

2   A    Two.

3         MR. CROWLEY:  Objection, relevance, Your Honor.

4   We set forth what Mr. Bloudson was involved in.  This goes

5   to Mr. Bloudson's role in this case.

6   BY MR. SHEA:

7   Q    All right so of those CWs?

8   A    Yes, sir.

9         MR. CROWLEY:  Objection, Your Honor, this is

10  discovery at this point.

11        THE COURT:  Okay wait til he gets his question

12  out.

13  BY MR. SHEA:

14  Q    Did you ever direct those CWs to attempt a controlled

15  purchase with Mr. Bloudson?

16  A    No, sir.

17  Q    Okay.  Did you ever ask any CW to attempt to

18  establish a relationship with Mr. Bloudson?

19  A    No, sir.

20  Q    Now again your testimony being asked regarding

21  violence of Mr. Bloudson, do you recall that?

22  A    I do.

23  Q    Okay, and so the, and correct me if I get it wrong,

24  but now you referenced a phone call that allegedly took

25  place between Mr. Bloudson and a Mr. Williams; is that

21

1   correct?

2   A    Yes, sir.

3   Q    Okay, and did you review the phone call for this

4   hearing today?

5   A    No, I did not.

6   Q    Okay, and do you know what year that phone call took

7   place?

8   A    It was I believe November, December 2014.

9   Q    Okay, and was it, now you didn't have a tap on Mr.

10  Bloudson's phone, correct?

11  A    We were not intercepting Mr. Bloudson's phone, no,

12  sir.

13  Q    And you never attempted to get a tap from Mr.

14  Bloudson's phone, correct?

15  A    Not, we, neither did we seek to get an affidavit to

16  intercept Mr. Bloudson's phone, no, sir.

17  Q    Okay but for your larger targets you did, isn't that

18  fair to say?

19  A    We defined targets that we were interested in

20  intercepting.  Mr. Bloudson's was not one of them.

21  Q    All right, meaning you did for other individuals,

22  correct?

23  A    Correct.

24  Q    Now back to that particular phone call, you said

25  that, so you set up all this surveillance at Dorchester

22

1  Court, some marked cruisers, some unmarked cruisers,

2  right?

3  A    That's correct.

4  Q    A fairly significant police presence, correct?

5  A    It's a presence to deter violence, yes.

6  Q    Okay, did anyone secure any photos of Mr. Bloudson

7  anywhere in the vicinity of Dorchester Court?

8  A    None that was reported to me.

9  Q    Okay, did any officer pull over Mr. Bloudson on his

10  way to Dorchester Court?

11  A    No one was stopped, sir.

12  Q    Do you have any information that Mr. Bloudson even

13  made his way anywhere within even miles of Dorchester

14  Court?

15  A    You'll have to ask him that.  I have no knowledge of

16  it, no.

17  Q    All right.  So there's no police report that shows

18  that Mr. BLoudson even went near Dorchester Court is

19  there?

20  A    There are no police reports filed, sir.

21  Q    Okay.  Were you present yourself that day?

22  A    I was in the wire room.

23  Q    Okay.  Did you hear any reports from anyone that Mr.

24  Bloudson was anywhere in the area?

25  A    I did not.

23

1  Q    So as you sit here today under oath, you have no

2  idea whether Mr. Bloudson responded at all, do you?

3  A    I have no knowledge whether he responded no.

4  Q    Now you said that on October 4, 2014 Mr. Jones had

5  reached out to Mr. Bloudson; is that fair to say?

6  A    That's correct.

7  Q    And you knew that because you had a tap on Mr. Jones'

8  phone, correct?

9  A    That's correct.

10  Q    And you said that after that phone call that Mr.

11  Bloudson went to Dorchester Avenue?

12  A    That's correct.

13  Q    And I think, forgive me if I missed something because

14  I'm trying to pick it up on the fly here, that it was a

15  Mr. Figueroa's apartment?

16  A    That's correct.

17  Q    Okay.  Do you have any pictures of Mr. Bloudson

18  anywhere in the vicinity of Dorchester Avenue?

19  A    I know at one point he was photographed there.  I'm

20  not exactly sure what date it was.

21  Q    Was it on one of the dates of these alleged

22  transactions?

23  A    I believe so.

24  Q    Did you review that for the hearing today?

25  A    I did not.

24

1  Q    Okay.  Now do you, did you review any report, did

2  you review the reports that were turned over today?

3            MR. CROWLEY:  Objection, relevance, Your Honor?

4            THE COURT:  Specific, more specific.

5  BY MR. SHEA:

6  Q    Okay.  Did you review any reports regarding Mr.

7  Bloudson today?

8  A    I reviewed the document that you have in your

9  possession.

10  Q    Okay.

11            THE COURT:  Can we identify that for the record

12  so we know what--

13            MR. SHEA:  Certainly.  I believe it's been

14  marked Government Exhibit No. 1.

15            THE COURT:  Page 4?  Am I correct, page 4?

16            MR. SHEA:  And it looks like, yes, page, one,

17  two - I have it as page 3 but--

18            MR. CROWLEY:  It's numbered as page 4, Your

19  Honor.

20            MR. SHEA:  Numbered as 4 but it's the third page

21  in the sequence.

22            THE COURT:  But numbered as 4 at the bottom?

23            MR. SHEA:  Yes.

24  BY MR. SHEA:

25  Q    So but that's pretty general.  Like, so that, let's,

25

1   on page 4 there is a photo of Mr. Bloudson, right?

2   A    Yes.

3   Q    And, or at least it purports to be, right?

4   A    It's a photo of Mr. Bloudson, yes, sir.

5   Q    Okay and--

6           THE COURT:  Taken on October 14th.

7           THE WITNESS:  Yes, yes, Your Honor.

8           THE COURT:  Yeah.

9   BY MR. SHEA:

10  Q    And where was that taken?

11  A    That was taken at 3 Ware Street in Dorchester.

12  Q    Okay.  Now 3 Ware Street is not 1900 Dorchester

13  Avenue, is it?

14  A    That's correct.

15  Q    How far is it from 1900 Dorchester Avenue?

16          MS. CUMMINGS:  Your Honor, at this point in time

17  we're going to object.  The Court asked to hear about

18  dangerousness as to Mr. Bloudson, that's what was

19  presented.  I understand it's a common practice for

20  counsel to use detention hearings as discovery

21  expeditions.  At this point in time and given that

22  enormous amount of time Mr. Shea has taken up on making

23  his arguments and making his point, we would just ask that

24  cross be limited to what the Court inquired of and what

25  was presented on direct.

26

1    THE COURT:  Try and keep it as narrow as you

2    can, Mr. Shea.

3        MR. SHEA:  I'm trying.  I'm only using the

4    address that they said where the drugs were.

5        THE COURT:  All right, all right but focus.

6    BY MR. SHEA:

7    Q    Okay, so that's Ware Street.  Are you saying Ware

8    Street is where he supposedly dropped the drugs off?

9    A    Dropped the drugs to Mr. Jones at 3 Ware Street, yes

10   sir.

11   Q    Do you have any pictures with him like, I see this as

12   a head shot right?  Do you have it in front of you?

13   A    You looking at the same thing I'm looking at sir.

14   Q    Okay do you have anything with him carrying anything?

15   A    Have you seen 62 grams of crack before?

16   Q    Yup.

17   A    You don't have to carry--

18       THE COURT:  You don't ask the questions.

19   A    I'm sorry.  You don't need to carry it in a bag, sir.

20   You put it in your pocket.

21   BY MR. SHEA:

22   Q    I'm just saying he didn't seem to be, you don't see

23   him carrying a bag?

24   A    No, I do not.

25   Q    Okay.  One moment.

1    You know what kind of hat he's wearing?

2         MR. CROWLEY:  Objection, Your Honor.

3         MR. SHEA:  Well it's actually relevant because

4    they said, I'd swear they, he just said he was a gang

5    member before, and in the affidavit they say the Columbia

6    Point Dogs like to wear hats with Ps on them cause they're

7    Point and that they, that's what they do and they wear

8    Pirates hats and Philly's hats to show that they're in the

9    gang.  So I think it's relevant to show that he's wearing

10   a hat that has no affiliation except I believe the Boston

11   Celtics.

12        THE COURT:  Well, it doesn't say in the

13   affidavit that they don't wear any other kind of hat.

14        MR. SHEA:  Right, but they don't have him

15   wearing it at all.

16        THE COURT:  Okay, move on, Mr. Shea.

17   BY MR. SHEA:

18   Q    So now you knew Mr. Bloudson to be living in

19   Weymouth, correct?

20   A    We learned that Mr. Bloudson was living in Weymouth.

21   He was reporting that he was living at 8 Wambach Street

22   through all the FIOs and all interaction with police.

23   Q    But were you present at all of those?

24   A    I was brief on several of them, sir.

25   Q    No, I'm asking, were you present?

28

1   A    No, I was not.

2   Q    Okay.  So you don't know and you didn't review the

3   booking tapes, correct?

4           MR. CROWLEY:  Objection, asked and answered.

5           THE COURT:  Sustained.

6   BY MR. SHEA:

7   Q    Now back to Weymouth.

8   A    Yes.

9   Q    Did - you haven't testified that you saw Mr. Bloudson

10  go and pick up any drugs in Weymouth, correct?

11  A    I haven't testified to that, no, sir.

12  Q    Did you ever observe him go to Weymouth to pick up

13  drugs?

14  A    No.

15  Q    Did you participate in drafting the affidavit in any

16  way for the search warrant in Weymouth?

17          MR. CROWLEY:  Objection, Your Honor, relevance?

18          MR. SHEA:  They're telling us that this isn't an

19  appropriate address for him to live at. I don't have the

20  affidavit to look at.  My point is that the only testimony

21  so far is about two addresses I don't intend to have my

22  client live at--

23          THE COURT:  Overruled.

24          THE WITNESS:  What's your question, sir?

25  BY MR. SHEA:

1   Q    Sure.  I guess back to the affidavit.  I asked if

2   you participated in the drafting of the affidavit for the

3   search warrant for Weymouth.

4   A    I'm certain there was some questions I was asked by

5   the affiant but I didn't draft it, no, sir.

6   Q    Okay.  Did you ever observe Mr. Bloudson allegedly

7   going to Weymouth after an intercepted phone call to pick

8   up either money or drugs?

9           MR. CROWLEY:  Objection, asked and answered.

10          THE COURT:  He may answer.

11   BY MR. SHEA:

12   A    I did not.

13   Q    Okay.  In preparation for this hearing today did you

14   read any reports or any affidavit that showed a connection

15   between the Weymouth address and Mr. Bloudson's alleged

16   drug dealing?

17   A    I really don't quite understand that question, but

18   Mr. Bloudson was observed by our surveillance team several

19   times at 8 Tara Drive in Weymouth leaving later in the

20   day, never early in the morning, arriving at several

21   different times of the day and operating various vehicles.

22   Q    No, what I'm saying is, let's be specific, let's be

23   specific like the prosecution and the Court would like.

24          The, you had said on direct testified, you heard

25   an intercept of a call from Jones and then you saw Mr.

1    Bloudson go from Dorchester Ave. to Ware Street, right?

2    A    I'm following you I just don't understand the

3    question.

4    Q    Okay, well I'll be specific.  Did you ever intercept

5    a phone call and after intercepting a phone call did you

6    see Mr. Bloudson go to Weymouth and then meet, go to some

7    other address that you felt he was delivering something?

8    A    I believe I've answered that question, no,

9    previously.

10   Q    Okay, and that's in your review of the materials for

11   this hearing, correct?

12        MR. CROWLEY:  Objection asked and answered.

13        THE COURT:  Sustained, moving on.

14   BY MR. SHEA:

15   Q    All right.  Is there anything in addition to the two

16   phone calls that you've testified to that you've reviewed

17   or know of that ties Mr. Bloudson to the sale of

18   narcotics?

19   A    Mr. Bloudson was arrested with Mr. Cepada at 15 Sedan

20   Street in Dorchester I believe three years ago where a

21   search warrant was executed subsequently and a firearm and

22   drugs were recovered from that location.

23   Q    That's three years ago.  I mean in this, was that

24   part of this investigation?

25   A    No, it was not.

31

1   Q    Okay, so let's keep it to this investigation.

2   They're going to want me to do that.

3            So in this investigation other than the two

4   phone calls that you just testified to, is there anything

5   else tying Mr. Bloudson to this conspiracy?

6            MS. CUMMINGS:  Your Honor, again, we put on--

7            THE COURT:  Asked and answered.

8            MS. CUMMINGS:  --evidence of dangerousness.

9            THE COURT:  Asked and answered.

10           MS. CUMMINGS:  Mr. Shea is well outside of that.

11   I know he thinks he's funny but at this point, nobody's

12   amused.

13           THE COURT:  The objection is sustained.

14           MR. SHEA:  Fine.  Let me just try it one other

15   way and see if--

16           THE COURT:  I think one more, one question.

17           MR. SHEA:  Thanks.

18   BY MR. SHEA:

19   Q    Thank you.  Other than the two phone calls you

20   testified to, do you have any other wiretap evidence of

21   Mr. Bloudson distributing narcotics?

22           MR. CROWLEY:  Objection, asked and answered.

23           THE COURT:  Sustained.

24   BY MR. SHEA:

25   Q    Well let's get to - I'll just go back to 1900

32

1    Dorchester Avenue.  Did other, on those two dates in

2    question that you've testified to on direct—

3    A    Uh-huh.

4    Q    --were other individuals surveilled from the

5    conspiracies, surveilled coming and going from that

6    building?

7    A    That was charged in the conspiracy or people that

8    were associated with Mr. Bloudson?

9    Q    Charged in the conspiracy.

10   A    No, sir.

11   Q    And on those two, just those two dates that you

12   testified to, did you see Mr. Jones that day?  Did you see

13   any interaction, physical interaction between Mr. Jones

14   and Mr. Bloudson?

15   A    Mr. Bloudson entered Mr. Jones' residence.

16   Q    Did you see the two of them physically together?

17   A    No, sir.

18   Q    Nothing more.  Thank you.

19           THE COURT:  All right.  Mr. Shapiro?

20           MR. SHARPIRO:  Thank you, Your Honor.

21           THE COURT:  Your welcome.

22   BY MR. SHAPIRO:

23   Q    Good afternoon, Detective Brown?

24   A    Good afternoon, Mr. Shapiro.

25   Q    Detective Brown, did you prepare this list of

33

1   controlled purchases?

2   A    I did not, sir, no.

3   Q    Did you assist in the preparation of it?

4   A    I supplied the controlled purchase reports.

5   Q    Okay, and am I correct that this list of controlled

6   purchases lists all of the controlled purchases which the

7   government is alleging Mr. Cepada was involved in?

8   A    That is correct, yes, sir.

9   Q    Now there were three, one on July 16, 2013 which you

10  list here, correct?

11  A    Yes.

12  Q    Were you, did you have any involvement in that

13  controlled purchase?

14  A    Yes, I did.

15  Q    And what was your involvement?

16  A    I was handling the CW.

17  Q    Handling the CW, that is you met with the CW before

18  the controlled purchase and then you interviewed and

19  debriefed the CW afterward?

20  A    As well as conducted surveillance during the

21  controlled purchase.

22  Q    Okay, so you actually saw the CW enter the building

23  and leave the building?

24  A    Yes, sir.

25  Q    And did the CW have a wire or any other kind of

34

1  surveillance equipment on him or her?

2  A    Yes.

3  Q    What kind of equipment?

4  A    A recording and audio device as well as an electronic

5  listening device.

6  Q    Okay, and were you able to follow what was going on

7  in real time as it went on through the listening device?

8  A    Yes, sir.

9  Q    And you prepared or did you have input in the report

10 of investigation that was prepared concerning this

11 particular incident?

12 A    I believe I may have authored a report.

13 Q    Okay, and the fact of the matter is that the report

14 only indicates that Mr. Cepada was present in the

15 apartment at the time of a transaction that was carried

16 out by other people, correct?

17 A    I would have to review the report to see if that's a

18 fact, sir.

19 Q    I'm going to show you a document and ask if you

20 recognize that.

21 A    Yes, sir, I do.

22 Q    Okay and why don't you just review briefly to

23 yourself and see if in fact it's not the case, that the

24 only reference is that Mr. Cepada was in the apartment and

25 there's no indication that he had anything to do with any

35

1  transaction.

2         THE COURT:  For the record, Mr. Shapiro, what

3  did you show the witness?

4         MR. SHAPIRO:  I'm showing Detective Brown a

5  report of investigation that's dated or refers to a

6  controlled purchase summary on July 16, 2013.

7         THE COURT:  Thank you.

8  PAUSE

9         THE COURT:  Brendan, Brendan?  Did you get a

10 motion from Charlie?  Did you get a motion?

11 PAUSE

12 BY MR. SHAPIRO:

13 A    Yes, sir.

14 Q    So the answer is that Mr. Cepada was present, but

15 there's nothing in this report indicating he had anything

16 to do with any drug transaction that took place, correct?

17 A    Yes, it states that Mr. Jones conducted the

18 transaction with the CW.

19 Q    So the only other reference to Mr. Cepada is that he

20 did give his number to the CI, correct?

21 A    That's correct.

22 Q    And that's what you were referring to in your

23 testimony before when you said that he gave his number to

24 the CI?

25 A    That's correct.

36

1 Q    But there's no indication that he was giving his

2 number to the CI in connection with any drug deal to come

3 or that had come is there?

4 A    He gave the number of himself as well as Mr. Jones to

5 the CW.

6 Q    And that's it.  Other than giving his number he

7 didn't say why he was giving the number, did he?

8 A    Did he tell them why?  Did he say call me for drugs

9 or something like that?

10 Q    Right, he didn't, did he?

11 A    I don't recall that, no, sir.

12 Q    In fact, the CI was a young woman, correct?

13        MR. CROWLEY:  Objection, Your Honor, relevance,

14 especially with the defendants?

15        THE COURT:  Sustained, sustained.

16 BY MR. SHAPIRO:

17 Q    But if it were a young woman he might have been

18 giving the number for that reason, mighten he.

19        MR. CROWLEY:  Objection, Your Honor.

20        THE COURT:  Sustained, sustained.

21 BY MR. SHAPIRO:

22 Q    In any case, despite the fact that on the basis of

23 your own report, Mr. Cepada had nothing to do with this

24 particular drug transaction, nevertheless it's listed on

25 this controlled purchase.

37

1      MR. CROWLEY:  Objection, calls for a legal

2  conclusion.  Mr. Cepada's charged with a conspiracy in

3  this case.

4      THE COURT:  He may answer.

5  A    No, that's not my belief at all sir, no.

6  BY MR. SHAPIRO:

7  Q    Nor is there any indication in his report that Mr.

8  Cepada had any conversation or agreement with other people

9  there with respect to that particular transaction, is

10 there?

11 A    I don't recall the full content of the recording,

12 sir.  I would have to review it.

13 Q    Well on the basis of your report there's nothing, is

14 there?

15 A    That was just a debrief of the CW.

16 Q    Yeah, but that wasn't my question.  On the basis of

17 your report, is there anything that indicates that?

18 A    Yes.

19 Q    That he had a conversation with, in connection with

20 the transaction?

21 A    Yes, because the initial target was Kareem Berry.

22 Kareem Berry escorted the CW to that place.  During that

23 transaction, Mr. Cepada gave the CW his number and as well

24 as David Jones' number and requested that she call in the

25 future.

38

1   Q    Well, that was at the end of any transaction,

2   wasn't it?

3   A    That was the end of the transaction that the CW

4   escorted for that particular day.

5   Q    But the fact of the matter is that your report does

6   not indicate that there was any conversation--

7           MR. CROWLEY:  Objection, asked and answered.

8           THE COURT:  Sustained.

9   BY MR. SHAPIRO:

10  Q    --with Mr. Jones.

11          MR. CROWLEY:  Asked and answered.

12          THE COURT:  Sustained.

13  BY MR. SHAPIRO:

14  Q    You also report on your, on the list that there was a

15  transaction on June 3rd of 2014?

16  A    Yes, sir.

17  Q    And that you record as a transaction involving 19.8

18  grams of crack?

19  A    That's correct.

20  Q    And did you recall that incident?

21  A    I mean I could be refreshed on it, but I recall it,

22  no.

23  Q    All right, were you involved in it in any way?

24  A    Yes.

25  Q    And how were you involved in it?

39

1  A    That's same manner I explained with the prior

2  controlled purchase.

3  Q    That is you talked to the CW prior to the incident

4  and you observed and surveilled the CW going and coming

5  and then you would debrief the CW?

6  A    Yes, sir.

7  Q    And was this CW on this occasion equipped with

8  recording devices?

9  A    Yes.

10  Q    And did you follow what took place on those recording

11  devices as it took place?

12  A    Did I listen?

13  Q    Yeah.

14  A    Yes.  Yes.

15         THE COURT:  The date again?

16         MR. SHAPIRO:  This was on June 3rd of 2014.

17         THE COURT:  2014, right.  Okay thank you.

18  BY MR. SHAPIRO:

19  Q    Now, isn't it true on this occasion, has, in the

20  occasion on July 16th of 2013, Mr. Cepada was present but

21  had nothing to do with any transaction that took place?

22  A    I would have to review the report, sir.  I don't

23  remember it verbatim.

24  Q    I'm going to show Mr., Detective Brown the report of

25  investigation which relates to the controlled purchase

40

1  summary of June 3, 2014, and if you'd just review it to

2  yourself to refresh your recollection.

3  PAUSE

4  BY MR. SHAPIRO:

5  A    Yes, sir.

6  Q    So my question was isn't it true that although Mr.

7  Cepada was present, he didn't have any involvement in the

8  alleged transaction involving crack cocaine.

9  A    The physical transaction took place between Mr. Jones

10  and the CW.

11  Q    Okay, and my question was there's no indication and

12  no evidence that Mr. Cepada was part of that transaction?

13         MR. CROWLEY:  Objection, calls for a legal

14  conclusion.

15         THE COURT:  Sustained.

16  BY MR. SHAPIRO:

17  Q    The only indication is that he was present, correct?

18  A    That's what's in the report, yes, sir, that he was

19  present.

20  Q    And in fact it indicates that he had some marijuana

21  which he was willing to sell?

22  A    Mr. Cepada informed the CW that he did possess

23  marijuana for sale, yes.

24  Q    Okay.  The only other occasion which you've listed is

25  on August 6, 2013 and that involved 15.3 grams of crack

1   and .3 grams of heroin?

2   A    Yes.

3   Q    And on that occasion, Mr. Jones conducted whatever

4   transaction was involving the heroin, correct?

5   A    Yes.

6   Q    And you do have reference in your report to Mr.

7   Cepada engaging in a transaction involving the 15 grams of

8   crack, correct?

9   A    If I could review the report, I could confirm that

10  for you.

11  Q    Excuse me?

12  A    If I could review the report?

13  Q    I'm showing Detective Brown a report of a controlled

14  purchase summary on August 6, 2013.

15  A    Yes, sir.

16  Q    So this, of the three transactions that you refer to

17  is the only one where according to the CW or the CI there

18  was an actual transaction involving Mr. Cepada, correct?

19  A    That was the phys, that was the one, the physical

20  transaction between Mr. Cepada, yes sir.

21  Q    Okay.  And in fact that's the only transaction

22  involving Mr. Cepada involved in this entire conspiracy,

23  isn't it?

24          MR. CROWLEY:  Objection, asked and answered.

25          THE COURT:  Sustained.

42

1 BY MR. SHAPIRO:

2 Q    Now you also indicated that you had information that

3 Mr. Cepada was a member of the CPD?

4 A    Yes, sir.

5 Q    Okay, and I believe you said that that was based on

6 the fact that he associated with some CPD members?

7 A    That was based on law enforcement personnel that I've

8 spoken with, community leaders, informants, gang members.

9 Q    So you say a lot of people told you that?

10 A    Yes, sir.

11 Q    Other than what people told you, did you have any

12 other evidence of a membership in CPD?

13 A    I believe Mr. Cepada's documented in our gang unit,

14 gang database as a member of CPD.

15 Q    Do you have those documents?

16 A    I do not.

17 Q    Have you provided those documents to the government

18 in this case?

19        MR. CROWLEY:  Objection, Your Honor, this is a

20 detention hearing, not a discovery hearing.

21        THE COURT:  Sustained, sustained.

22 BY MR. SHAPIRO:

23 Q    Do you, other than the context that Mr. Cepada, you

24 say Mr. Cepada had with the people who are referred to in

25 these reports, is there any other evidence that you are

43

1  aware of showing that he had contact with other members

2  of CPD?

3  A    I'm trying to understand the totality of the

4  question.  What do you mean have I seen him with other

5  people outside of the 48 defendants?  Is that the question

6  that you're asking?

7  Q    My question is other than the people in these, that

8  are referenced in these reports, do you have evidence of

9  Mr. Cepada associating with other CPD members or people

10 you consider to be CPD members?

11 A    I don't recall that right off the bat, I mean just as

12 we sit here today.

13        MR. SHAPIRO:  Okay.  Thank you, I have nothing

14 further.

15        THE COURT:  Any redirect?

16        MR. CROWLEY:  One.

17                  REDIRECT EXAMINATION

18 BY MR. CROWLEY:

19 Q    Calling your attention to page 5 of the exhibit,

20 there's a brief discussion about the August transaction,

21 was that also video-recorded?

22 A    Yes, it is.

23 Q    And is that still shot from that recording?

24 A    It is.

25 Q    Of Mr. Cepada--

44

1      THE COURT:  Yeah, okay.

2  BY MR. CROWLEY:

3  Q    --counting cash?

4  A    Yes.

5  Q    No further questions, Your Honor.

6      MR. KATZ:  Your Honor, with the--

7      THE COURT:  Just one second.

8      MR. KATZ:  Okay.

9      THE COURT:  Do you want to take him in back or?

10  You okay?  Stretch a little bit.

11      MR. KATZ:  Your Honor, with the Court's

12  indulgence and if Mr. Crowley would like to direct him

13  first that's fine, but because the detective is here and I

14  expect the dangerousness issue will come up for my client

15  Mr. Cureton, he was mentioned in this direct examination--

16      THE COURT:  Well when you come back with a

17  package for Mr. Cureton, then if we need a witness we'll

18  do it.

19      MR. KATZ:  All right, could I cross examine him

20  on the one issue where he raised Mr. Cureton's name?

21      THE COURT:  No, not at this time.

22      MR. KATZ:  No, okay, thank you.

23      THE COURT:  All right, you may step down,

24  Detective Brown.

25      WITNESS, excused.

45

1          THE WITNESS:  Thank you, Your Honor.

2          THE COURT:  Further witnesses for the

3    government?

4          MR. CROWLEY:  None, Your Honor.

5          THE COURT:  Witnesses for the defendants?

6    Defendant's no?  All right as to Mr. Bloudson and Mr.

7    Cepada, I'll take the matter under advisement.  All right.

8          MR. CROWLEY:  Thank you, Your Honor.

9          THE COURT:  Hearing nothing else, the defendants

10   are remanded to the custody of the United States Marshals.

11         MS. CUMMINGS:  Thank you, Your Honor.

12         THE COURT:  Your welcome.

13   (Court adjourned)

14   (3:19:20 PM)

15

16

17

18

19

20

21

22

23

24

25

46

1            CERTIFICATION

2      I, Maryann V. Young, court approved transcriber,

3    certify that the foregoing is a correct transcript from

4    the official digital sound recording of the proceedings in

5    the above-entitled matter.

6

7    /s/ Maryann V. Young              July 20, 2015

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25