### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | . CRIMINAL NO. 15-10148-LTS |
| | . |
| V. | . BOSTON, MASSACHUSETTS |
| | . JULY 27, 2015 |
| DAVID JONES, KAREEM BERRY | . |
| AARON BLOUDSON, JORGE CEPEDA | . |
| DEARRON CURETON, FRANKIE FINKLEA | . |
| RASHEED MARSMAN, Rahzhan Spriggs | . |
| And Esteve Diaz | . |
| Defendants | . |

. . . . . . . . . . . . . . . . . . . . .

TRANSCRIPT OF STATUS CONFERENCE
BEFORE THE HONORABLE MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Government:

UNITED STATES ATTORNEY'S OFFICE
Emily O. Cummings, Esq.
Michael J. Crowley, Esq.
J. Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
617-748-3120
emily.cummings@usdoj.gov
Michael.crowley@usdoj.gov

For defendant David Jones:

BOURBEAU AND BONILLA, LLP
Michael C. Bourbeau, Esq.
One Commercial Street, Unit
One Boston, MA 02109
617-350-6565
mike@lawgenie.com

For defendant Spriggs:

DEMISSIE & CHURCH
Derege Demissie, Esq.
929 Massachusetts Avenue, Suite 01
Cambridge, MA 02139
617-354-3944
dd@demissiechurch.com

For defendant Berry:

J.W. CARNEY, JR.& ASSOCIATES
Samir Zaganjori, Esq.
20 Park Plaza, Suite 1405
Boston, MA 02116
617-933-0350
szaganjori@carneydefense.com

For Defendant Bloudson:

SHEA & LAROCQUE
Mark W. Shea, Esq.
929 Massachusetts Avenue, Suite 103
Cambridge, MA 02139
617-577-8722
markwshea@gmail.com

For Defendant Cepeda:

SHAPIRO, WEISSBERG & GARIN
Jonathan Shapiro, Esq.
90 Canal Street, Suite 500
Boston, MA 02114-2022
617-742-5800
jshapiro@sswg.com

For Defendant Cureton:

ROPES & GRAY LLP
Aaron Katz, Esq.
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
617-951-7281
jlevy@ropesgray.com

For Defendant Finklea:

Paul J. Garrity, Esq.
14 Londonderry Road
Londonderry, NH 03053
603-434-4106
garritylaw@myfairpoint.net

For Defendant Marsman:

NATOLA ASSOCIATES, LLC
Michael F. Natola, Esq.
175 Andover Street, Suite 205
Danvers, MA 01923
978-739-9300
MNatola@NatolaAssociates.com

For Defendant Diaz:

Michael Liston, Esq.
25 Mt. Vernon Street
Cambridge, MA  02140
857-259-6040
michaeljliston@gmail.com

Court Reporter:

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**MARYANN V. YOUNG**
**Certified Court Transcriber**
**Wrentham, MA  02093**
**(508) 384-2003**

4

1   (Case called into session)

2   (2:35:33 p.m.)

3          THE CLERK:  The Honorable Marianne B. Bowler

4   presiding.  Today is Monday July 27, 2015.  The case of

5   U.S. v. Jones et al., Criminal Action No. 15-10148 will

6   now be heard.  Will counsel please identify themselves for

7   the record.

8          MS. CUMMINGS:  Good afternoon, Your Honor, Emily

9   Cummings and Michael Crowley on behalf of the United

10  States.

11         THE COURT:  Thank you very much.

12         MR. BOURBEAU:  And good afternoon, Your Honor,

13  Michael Bourbeau for David Jones.

14         THE COURT:  Thank you.

15         MR. DEMISSIE:  Good afternoon, Your Honor,

16  Derege Demissie for Rahzhan Spriggs.

17         MR. SHAPIRO:  Good afternoon, Jonathan Shapiro

18  for Jorge Cepeda.

19         MR. LISTON:  Good afternoon, Your Honor, Michael

20  Liston for Esteve Diaz.

21         MR. KATZ:  Your Honor, Aaron Katz for Dearron

22  Cureton.

23         MR. ZAGANJORI:  Good afternoon, Your Honor, Sam

24  Zaganjori for Kareem Berry.

25         MR. SHEA:  Good afternoon, Your Honor, Mark Shea

5

1    for Aaron Bloudson.

2             MR. GARRITY:  Your Honor, good afternoon, Paul

3    Garrity for Frankie Finklea.

4             MR. NATOLA:  And finally, Your Honor, good

5    afternoon, Michael Natola for Rasheed Marsman.

6             THE COURT:  Last but not least, Mr. Natola.  All

7    right, where are we?

8             MS. CUMMINGS:  Your Honor, the government has

9    produced its initial automatic discovery disclosure with

10   8500 pages of discovery as well as a hard drive containing

11   controlled buy videos, wire intercepts, turret tapes and

12   all the media with the exception of the pole camera

13   footage which we can make available to counsel as they

14   need it.

15            THE COURT:  And the 8500 pages is produced in

16   what format?

17            MS. CUMMINGS:  We uploaded it onto a file share

18   website to the attorneys at this point who have assented

19   to the protective order.  We sent them a password.  We

20   created an account for them.  They've been able to log on

21   and then they can download the materials into any database

22   system that they prefer to use or just as pdfs.  The

23   information is searchable.  We've turned over an index to

24   the website data, an index to the hard drive data,

25   instructions on how to use the website.  The hard drives

6

1   are pretty self-explanatory.  So at this point in time

2   the government anticipates probably one more smaller size

3   discovery disclosure.  We're just waiting for the sort of

4   final reports to come in, final photos for search

5   warrants, final drug test analysis to come in.  Given

6   backups of the DEA lab I believe we should be able to do

7   another production that will hopefully contain all of this

8   information maybe 60 days out.  So I believe at this point

9   in time that's sort of the status of the case.

10          The issue outstanding I believe today aside from

11  excluding the time from the initial appearance is the

12  protective order that the government has filed.

13          THE COURT:  All right, well this is, I'll refer

14  to as the Jones case as the lead defendant.  In this group

15  who has not assented?

16          MR. BOURBEAU:  David Jones to start with.

17          MR. GARRITY:  Frankie Finklea.

18          MR. SHEA:  Aaron Bloudson.

19          MR. SHAPIRO:  Jorge Cepeda.

20          MR. KATZ:  Your Honor, we did assent but I want

21  to put on the record that it was on the understanding that

22  this did not shift the burden, burden of persuading once

23  we wanted to get documents to our client.

24          THE COURT:  All right, so we have four--

25          MR. DEMISSIE:  I assented subject to the outcome

1  of the pending motion.

2        THE COURT:  All right.  Well how are we going to

3  proceed here?

4        MR. BOURBEAU:  Well first of all Your Honor if I

5  could just make clear that when it says the government has

6  disclosed this discovery.  They have not disclosed one

7  thing to the individuals who objected to the protective

8  order, this blanket protective order.  They haven't

9  complied with Rule 16.  They haven't complied with Rule

10  116.6 in either submitting an affidavit as to why a

11  particularized need is necessary as to each individual

12  defendant.  They – so at this point in time I don't

13  believe the government's complied with its initial

14  obligations.

15        THE COURT:  What's your response?

16        MR. CROWLEY:  Your Honor, we submitted the

17  protective order.  We'd note that if you want to go

18  through each of these defendants they are all members of

19  Columbia Point.  Mr. Bourbeau's client has a prior arrest

20  for intimidation of a witness.  He has a prior conviction

21  for intimidation of a witness.  Mr. Bloudson, the Court

22  heard testimony on him speaking to the leader of another

23  group about attacking rival gang members.  And if the

24  Court wants we'll submit the media that shows Columbia

25  Point leaders putting out into the internet copies of

1  grand jury testimony, copies of police reports with the

2  names still on them in order to have these people attacked

3  and retaliated against.  That's the case law that we

4  submitted, cases consistently do this with violent gang

5  cases and this is one of them.  And to submit affidavits

6  for everyone if they would like us to that we're prepared

7  to do so but Mr. Cepeda has crimes of violence in his

8  background including possession of a firearm.  Mr.

9  Finklea--

10         THE COURT:  Have you sat down at all and tried

11  to work this out?

12         MR. CROWLEY:  Well what we've offered to do is

13  if there are specific documents that they want us to turn

14  over we can work on getting those turned over.  In

15  addition we're prepared to give a copy, we've spoken to

16  the correctional institutes, they have copies there that

17  they can review.  All we're saying is we don't want

18  unencumbered access to paper to individuals who have shown

19  in the past the gang itself that it will use that to

20  intimidate and attack witnesses.  So we would be prepared,

21  if they have specific documents that they want to turn

22  over, to do that in a fashion that is controlled with

23  things like watermarks so that if they are disclosed and

24  put out there we'll know which defendants did so.

25  Otherwise you're in a position where no matter which

1  defendant is in the institute someone else will say give

2  me that document.  That shows a cooperator or that shows a

3  witness and then we're in a position exactly what those

4  cases said that by the time we find out about that if it's

5  on the internet or it's given to someone else and sent out

6  in mail where are we going to find it, after a shooting?

7          MS. CUMMINGS:  Your Honor, if it does help I

8  think because I've primarily had the most contact with

9  counsel on this matter we're pretty much split on who's

10 assented to the protective order and who has not at this

11 point in time.  The concerns, and we do understand

12 counsels' concerns in terms of the amount of time and

13 resources spent reviewing discovery with individual

14 defendants, our main concern is really the protection of

15 identified witnesses and witnesses unidentified at this

16 point in time.  And this is a group who has publicly

17 threatened witnesses through the use of discovery

18 materials obtained in prior cases.  What we've attempted

19 to do in concert with defense counsel is give them access

20 to all of the discovery.  They can if they have pages that

21 they want their individual clients to have let us know the

22 Bates ranges.  We've put a watermark on those Bates ranges

23 and then they're free to give them to their clients.  If

24 their clients, if these Bates ranges make it to the

25 internet or are found being passed around we know who had

10

1   what.

2           We've also, understanding the concerns about the

3   time it would take individual counsel to go down and meet

4   with their clients to review everything, we've spoken to

5   the heads of the various institutions housing the

6   individuals in custody.  We've made arrangements for them

7   to have not just computer access to all the tapes and the

8   media that they would ordinarily have computer access to

9   because I understand there's not a lot of, it's a lot of

10  materials to be viewed on only a couple computers.  They

11  only have two hours a day.  So we're making arrangements

12  to also send down paper copies of whatever we can and they

13  can check it out like at a library, look through it, read

14  it at their leisure and then return it.  They're not

15  allowed to copy it.  They're not allowed to keep it.  So

16  we really have worked with defense counsel to really focus

17  the point of this protective order which is to say there's

18  48 defendants the majority of whom are in custody.

19          There's 8500 pages of discovery.  Times that by

20  48, that's a lot of paper to be floating around in

21  correctional institutions and this is a group that is

22  prone to violence, and so this is a way that we have tried

23  to balance the interest of the government in protecting

24  witnesses as well as the rights of the defendants to have

25  access to their discovery materials to assist in their

11

1   defense.  We don't want to inhibit that, but we do want

2   to make sure that we're working in a way that really is

3   taking precautionary measures because there are

4   cooperating witnesses still at large. There are also other

5   witnesses at this point who are at large that we are, the

6   government's interest is in protecting.  This isn't a

7   group that, you know, you have no evidence of them

8   tampering with witnesses or disclosing discovery in the

9   past.  You have a lot of it.  It's publicly available and

10  we can submit discs of these YouTube videos to the Court

11  for you to review to see exactly what it is that is

12  concerning the government.  But we have talked to 23

13  different attorneys numerous times and really tried to

14  listen to their concerns and come up with some sort of

15  agreement that isn't ideal on both sides.  It creates some

16  work on our side as well as their side, but it really

17  tries to meet everybody's needs at this point in time.

18          THE COURT:  Mr. Bourbeau?

19          MR. BOURBEAU:  Thank you, Your Honor.  Well

20  first of all I object to the group and lumping everybody

21  individually together.  There is not one single bit of

22  evidence that Mr. Jones disclosed anything previously or

23  ever made any videotapes or is involved in making any

24  videotapes.  And to lump them together as a group I think

25  is wrong.

1      Number two, the government's premise seems to

2  be based on Jencks Act material.  This is not the time for

3  Jencks Act disclosures.  My understanding from those

4  people who have received the discovery this is the same

5  discovery we get in all these cases.  It's already been

6  redacted.  The names have been taken out so there's no

7  fear of disclosing names based on the discovery that's

8  being produced at this time.  This is standard Rule 16 and

9  Rule 116 material that's given in every case.

10      The suggestion that I had proposed is to give an

11  individual protective order to the client.  That has been

12  done, it was done in the *Salemme* case, the LCN cases,

13  where certainly more fear of murders.  Interesting enough

14  in--

15      THE COURT:  Why can't we do that?

16      MR. CROWLEY:  Well the issue with the individual

17  protective order is how do you enforce it?  Like co-

18  counsel said you're dumping out thousands of pages of

19  documents and that's what those cases discussed that we

20  cited that how do you find out about this until the damage

21  is already done and that's the issue we have here, that

22  Mr. Shea chose to ignore in his pleading.  If he looks at

23  his pleading where he cited the *Garcia* case, in that case

24  the Court said it would allow information about witnesses

25  to go if it was all completely redacted.  So that's part

1  of what counsel was noting that if we, we're prepared to

2  work with counsel on that which would be the issue of they

3  want to turn over certain amounts of documents to their

4  client.  This isn't limiting their access to the

5  documents.  It's limiting their ability to have copies of

6  them.  And again if the Court wants us to submit the

7  YouTube videos what they make clear, and this is what's

8  set forth in the New York cases, is that one of the ways

9  to prove that someone is cooperating is to turn over what

10 they call paper, and paper is what allows them to move

11 forward.

12        Tony Berry who is one of the leaders of Columbia

13 Point and in this case has a video where he discussed what

14 does or does not constitute enough paper to have something

15 done to someone.  So what we're saying is it's the actual

16 paper and that's what the courts noted in New York that

17 that is what's used in gang cases as a means of targeting

18 people.  So this case a protective order to one individual

19 how do you know when you dump out these many documents to

20 all of them he hands it to another person and that goes

21 around the jail and when you find him if they identify the

22 CW, and they can identify CWs by which deals took place

23 when, and then what they have is a stack of paper, and if

24 the Court wants to look at those videos they hold them up

25 and they say this shows that this person is a rat and that

14

1  steps should be taken against him.

2          So what we're prepared to do is take steps to

3  get what they need but to just dump out with a protective

4  order on an individual – by the way Mr. Bourbeau's client

5  when he says it's not a group thing, it is a group thing.

6  He is a member of Columbia Point.  If he wants to dispute

7  that we'll have a hearing on it.  But I would note his

8  client does have a conviction for intimidation of

9  witnesses and a charge that was two years later.  So to

10  say that there's nothing for Mr. Bourbeau's client that

11  shows that he does exactly what Columbia Point does is

12  simply not right.  If you go through every one of their

13  criminal records they're replete with violence,

14  intimidation.  These are things that exist not in every

15  case that come in this district but in every gang case

16  around the country.

17          THE COURT:  All right, Mr. Shea first and then

18  Mr. Bourbeau.

19          MR. SHEA:  Perhaps if we combine Mr. Bourbeau's

20  suggestion with the watermark that's been mentioned

21  earlier then you would be able to track if my, say my

22  client shared a document it would have my name--

23          THE COURT:  Why not?  That seems reasonable to

24  me.

25          MS. CUMMINGS:  Your Honor, if Mr. Shea wants to

1   agree to the protective order, let us know what

2   documents he'd like to give his client, we'll throw a

3   watermark on it and he can send it to his client.

4           MR. SHEA:  But that--

5           MS. CUMMINGS:  He doesn't even need to take the

6   additional step--

7           THE COURT:  Are you willing to do that?

8           MS. CUMMINGS:  --of getting his client to sign

9   on to anything.

10          MR. SHEA:  No.

11          MS. CUMMINGS:  See, we're not dealing with

12  reasonable minds.

13          MR. SHEA:  Wait, wait--

14          THE COURT:  Let's not make any judgments here.

15          MS. CUMMINGS:  It wasn't.

16          MR. SHEA:  For one, I really don't feel like

17  identifying for the government what I think are the

18  relevant documents for my clients.  I perceive my job and

19  part of the attorney-client privilege is not telling the

20  government everything I'm sending my client so I don't--

21          THE COURT:  Well put a watermark on everything

22  then.

23          MR. SHEA:  That's what I'm suggesting.

24          MS. CUMMINGS:  Then we have no way of tracking

25  it back to who's distributing it, Your Honor, and that's

1  the issue.  Why should the whole group be held

2  accountable if one individual--

3          THE COURT:  You put a different watermark on

4  every document going to; I mean you put a watermark unique

5  to each defendant on every piece of paper.

6          MS. CUMMINGS:  We can't do that, Your Honor.

7  You know what, we can if the Court's going to give us six

8  months to get all of that done but that's what we're

9  talking about.

10          THE COURT:  I find it hard to believe.

11          MS. CUMMINGS:  And what we were trying to deal

12  with is getting discovery out--

13          THE COURT:  Well I'm going to ask you to look

14  into that.  I think that's the solution and I want you to

15  find out what, give me a report in a week why you can't do

16  that.

17          MS. CUMMINGS:  Watermark every document.

18          THE COURT:  Going to each defendant.  Unique

19  watermark per defendant.

20          MS. CUMINGS:  Okay.

21          MR. SHAPIRO:  I'd just like to point out this

22  happens in the state cases all the time.  Every document I

23  receive in a state case has my name watermarked on

24  thousands of pages.  You know that's done when they make a

25  pdf.

1           THE COURT:  Exactly.

2           MR. SHAPIRO:  They simply put the watermark on

3   top of everything else and the fact that they made pdfs of

4   everything it's easy enough--

5           THE COURT:  It should be doable.

6           MR. SHAPIRO:  --to add a watermark to it.

7           THE COURT:  It should be.

8           MS. CUMMINGS:  Your Honor, it's not the way that

9   the discovery is produced in this case.  Discovery was

10  produced through this USA FX system that allows them to

11  download so it's not produced like any other case where

12  there's a thousand documents.

13          THE COURT:  Well look into it.  I'm giving you a

14  week to give me a report.  Mr. Liston?

15          MR. LISTON:  Just a matter of clarity for me.

16  There is discs that include what could be made into

17  documents, eight thousand sum odd pages.  But I also

18  received, and I have to figure out how to use it, a hard

19  drive and presumably the hard drive can be translated into

20  pdf documents so that I don't think those are documents

21  that are already or somewhere they might be in paper form

22  but it's, the impression I get is they're likely to be

23  well more than 8500 pages of documents if you include

24  everything in every form of the discovery.

25          THE COURT:  All right, I note that we have Mr.

18

1   Andrews known to you all present in the courtroom who is

2   now overseeing the CJA payment.  So one of the things

3   particularly in a large case like this is the CJA payment

4   issue, so I remind you that he'll be looking at everything

5   so try and keep it as tailored as you can.  And if you

6   have questions you can contact him.  You're available for

7   consultation, Mr. Andrews?

8           MR. ANDREWS:  Absolutely, Your Honor.

9           THE COURT:  All right.  He's well known to all

10  of you.

11          Well let's pick another date for a further

12  status conference.  Can we have a date, Brendon,

13  approximately - you think you're going to have another

14  disclosure in about 60 days?

15          MS. CUMMINGS:  No, Your Honor.  With these

16  individualized tailoring it's going to be probably double

17  that.

18          THE COURT:  Well let's have a conference in

19  about 60 days.

20          THE CLERK:  How about the 21st of September at

21  2:30, two o'clock, sorry.

22          THE COURT:  September 21st at two p.m.  And

23  counsel, you know, if you don't have an issue to raise you

24  can have brother or sister counsel cover you at these

25  conferences.  You get me that report a week from today and

1    we'll go from there on that issue.

2         MR. BOURBEAU:  Your Honor, at a minimum I would

3    certainly request the government to produce standard Rule

4    16 because, again, I think they're mixing between what is

5    Jencks material and what is Rule 16 material and they

6    certainly at a minimum some discovery could be provided

7    whether it's the audiotapes, the videotapes that are all –

8    those could all be provided without basically saying

9    unless you sign the protective order we're not going to

10   give you anything.

11        MS. CUMMINGS:  Your Honor, you're either giving

12   us a week to look into it or you're not.  I understand

13   that Mr. Bourbeau wants his cake and eat it too, but we're

14   doing the best we can to be as reasonable as we can.

15        THE COURT:  Okay, I'll give you a week.  Get me

16   the report a week from today.  I'll convene another

17   conference at least with counsel for whom this issue is

18   relevant if need be, all right?  All right.

19        MR. KATZ:  Your Honor, if I may just quickly.

20   So again I share the same concern as Mr. Shea, didn't want

21   to provide a handful of documents to the prosecution

22   saying I want to get these particular documents.  We are

23   planning on looking in at our own firm about how much it

24   would cost for us to watermark all 8500 pages.  If we can

25   put an individualized watermark in the next several days

1    would that be sufficient in Your Honor's view?

2              THE COURT:  That would be helpful certainly.

3    Very helpful.  All right.

4              MS. CUMMINGS:  And counsel's free to do that.

5    If they can let us know what the watermark is then they

6    can - that's fine.  We have no issue with that.

7              THE COURT:  All right.

8              UNIDENTIFIED:  Your Honor, just understand this

9    is a question of expense and at least for persons who are

10   in custody--

11             THE COURT:  I said.

12             UNIDENTIFIED:  Well it is a lot of expense

13   potentially, but somebody brought up earlier in

14   discussions before this hearing the concept of providing

15   laptop computers to individual defendants who are in

16   custody so that they have only in form that will not

17   permit them to make copies and they can use the laptop

18   perhaps outside of the library so they have more time to

19   use it.

20             THE COURT:  We're getting into the institution

21   and the rules and if you can look into it and work

22   something out I'm certainly happy to entertain it, but I'm

23   not in a position to order it.

24             All right, on behalf of those defendants

25   represented here today who have identified themselves at

21

1  the outset on the record, do you all agree to exclude

2  the time from now until the 21st of September?

3          ALL COUNSEL:  Yes, Your Honor.

4          THE COURT:  All right.

5          MR. DEMISSIE:  On behalf of Mr. Spriggs, yes,

6  Your Honor.

7          THE COURT:  All right.

8          UNIDENTIFIED:  Yes, Your Honor.

9          THE COURT:  All right, hearing no negative

10  responses will the government file an assented to motion

11  to that effect?

12          MR. CROWLEY:  We will, Your Honor.

13          THE COURT:  All right.  Now I'll move onto the

14  next group.

15  (Court adjourned)

16  (2:56:15 PM)

17

18

19

20

21

22

23

24

25

22

CERTIFICATION

1

2     I, Maryann V. Young, court approved transcriber,

3  certify that the foregoing is a correct transcript from

4  the official digital sound recording of the proceedings in

5  the above-entitled matter.

6

7  /s/ Maryann V. Young              September 21, 2015

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**MARYANN V. YOUNG**
**Certified Court Transcriber**
**(508) 384-2003**