UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                            )
**UNITED STATES OF AMERICA**    )
                                            )
                                            )   **CRIMINAL NO.**
               **v.**                        )   **15-10148 - LTS**
                                            )
**ESTEVE DIAZ**                      )
_____)

## DEFENDANT ESTEVE DIAZ'S SENTENCING MEMORANDUM[1]

On November 20, 2015, the defendant Esteve Diaz ("Diaz") entered a guilty plea to a one count indictment charging him with conspiring to distribute controlled substances in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 846. Diaz pled guilty to so much of the indictment that charged a conspiracy to distribute cocaine base. Diaz did not plea to conspiring with all the other defendants named in the indictment, but to a subset conspiracy, i.e., a conspiracy involving him and one of the named defendants.

Diaz's plea was entered in conjunction with a plea agreement made pursuant to F.R.Crim. P. 11(c)(1)(C). The agreed upon disposition is a term of imprisonment within the range of 48 to 57 months. In paragraph 4 of the plea agreement, the government and Diaz agreed that Diaz's base offense level was level 24 and his total offense level was level 21.

---

[1] This Memorandum focuses on issues relating to the court's sentencing choices. There are portions of the PSR, however, that do not affect guideline calculations but could be prejudicial to Diaz's Bureau of Prisons classification or the availability of prisoner programs. Diaz will deal with such issues, if necessary, at sentencing.

On February 17, 2016, the Probation Office issued its initial Presentence Report ("PSR"). The Probation Office calculated Diaz's base offense level at level 24, PSR ¶ 100, and was thus consistent with the parties' position as set forth in paragraph 4 of the plea agreement. However, the Probation Office calculated Diaz's total offense level at level 23, PSR ¶ 109, rather than the level 21 as set forth in paragraph 4 of the plea agreement. This was the result of the Probation Office's application of a two point offense level enhancement under USSG §2D1.1(b)(1) for his alleged possession of a "switch blade style knife" when he was arrested following a transaction with co-defendant Jones. Diaz objected to this two level enhancement. See Objections to PSR ¶¶ 42, 101,109 and 175. The Probation Office also concluded that Diaz's criminal history placed him in criminal history category VI. PSR ¶¶ 127 and 128. Diaz does not contest the technical accuracy of this calculation, but in his objections, see Objection to PSR ¶ 193, Diaz asserted that there was an overstatement of his criminal history warranting a downward departure under USSG §4A1.3(b), and/or *Booker* variance, to criminal history category V. The Probation Office's calculation of a total offense level 23 in criminal history category VI produced a guidelines sentencing range of imprisonment commencing at 92 months. A total offense calculation of 21 in criminal history category V produces a guideline sentencing range of imprisonment commencing at 70 months.

Diaz acknowledges that the F.R.Crim. P. 11(c)(1)(C) proposed disposition of 48 to 57 months imprisonment is more favorable to him than a sentence imposed in strict accordance with the applicable sentencing guidelines. As more fully set forth below, however, Diaz submits that a sentence within the plea agreement range is a reasonable sentence and one that is sufficient but not greater than necessary to comply with the purposes set forth in 18 U.S.C. 3553(a).

Summary of Drug Crime Sentencing Since 1970

There were no minimum mandatory sentences in the original 1970 § 841(b); only sentences with a maximum term of imprisonment which for first offense convictions could not exceed 15 years.[2] There was also parole eligibility after serving one-third of the sentence imposed. Moreover, there were no increased sentences based on the quantity of the controlled substance involved in the § 841(a) conduct. The § 841(a) distribution or manufacture of any amount of a scheduled controlled substance would generate the § 841(b) maximum penalty assigned to the schedule classification of that substance.[3] Drug quantities or purity levels were matters for the court to consider, or not to consider, in the course of sentencing discretion which was virtually unreviewable.

This sentencing structure and related broad sentencing discretion persisted until the mid-1980s. The Controlled Substances Penalties Amendments Act of 1984[4] amended § 841(b) to create for the first time quantity dependent increases in the maximum penalties for § 841(a) conduct involving Schedule I or II narcotic

---

[2]  Under § 802(16) of the 1970 Act, the term "narcotic drug" was defined to encompass opiates, cocaine and their respective salts and derivatives. Pub. L. No. 513, § 102(16), 84 Stat. 1244 (1970). Under the original § 841(b)(1)(A), the sentence for the first offense distribution of a controlled substance in Schedule I or II which was a "narcotic drug" was "not more than 15 years." Under § 841(b)(1)(B), the sentence for the first offense distribution of a controlled substance in Schedule I or II which was not a "narcotic drug" or of a controlled substance in Schedule III, was "not more than 5 years." Under § 841(b)(2), for controlled substances in Schedule IV, the sentence for a first offense conviction was "not more than 3 years;" and under § 841(b)(3), for controlled substances in Schedule V, the sentence for a first offense conviction was "not more than one year." Pub. L. No. 513, § 401(b), 84 Stat. 1261 (1970).

[3]  There was an exception in the 1970 legislation which has not been altered. Title 21 U.S.C. § 841(b)(4) covers the distribution of a "small amount of marihuana for no remuneration," and treats such a distribution as a misdemeanor.

[4]  Pub. L. No. 98-473, Title II, Ch. V, § 501, 98 Stat. 2068 (1984). This Act was Ch. V of the Comprehensive Crime Control Act of 1984, Pub. L. No. 98-473, Title II 98 Stat. 1837, *et seq*. (1984). The Sentencing Reform Act of 1984, which spawned the guidelines, was also part of Pub. L. No. 98-473, Ch. II § 211 *et seq.*, 98 Stat. 1987 *et seq.* (1984).

drugs, marijuana, hashish, PCP, and LSD.[5] The amendments also eliminated disparities caused by classifications of controlled substances as narcotic or non-narcotic and the penalty increases were relatively modest. The new maximum penalty for a first offense conviction was increased to 20 years. Moreover, the quantity measurements were based on the weight of the pure substance, not on the weight of the entire mixture containing the substance.[6]

Two years later the Narcotic Penalties and Enforcement Act of 1986[7] again amended § 841(b) by substantially increasing maximum penalties, continuing and increasing quantity dependent maximum penalties, and adding quantity dependent minimum mandatory sentences. The § 841(b) quantity dependent sentencing ranges attached to a limited number of controlled substances, namely, heroin, cocaine, PCP, LSD, fentanyl and marihuana.[8] With one exception,[9] however, the

---

[5] The 1984 amendments added a new § 841(b)(1)(A) to cover the quantity dependent increases in the maximum penalty for Schedule I or II narcotic drugs, PCP and LSD. The new maximum penalty for a first offense conviction was 20 years. The previous § 841(b)(1)(A) was redesignated as § 841(b)(1)(B) and was amended to cover controlled substances in Schedule I and II, "except as provided in subparagraphs (A) and (C)." The maximum penalty under the new § 841(b)(1)(B) was 15 years. This was an increase from 5 years for Schedule I and II controlled substances that were not narcotic drugs and were not covered in an amended § 841(b)(1)(C). Under the amended § 841(b)(1)(C), cases involving less than 50 kilograms of marijuana, 10 kilograms of hashish, or 1 kilogram of hashish oil or in the case of any controlled substance in Schedule III" the maximum penalty was 5 years imprisonment. *See* Pub. L. No. 98-473, Ch. V, § 502, 98 Stat. 2068 (1984), codified at 21 U.S.C. § 841(b) (Supp. II 1982).

[6] "The 1984 amendments were intended 'to provide a more rational penalty structure for the major drug trafficking offenses,' S.Rep. No. 98-225, p. 255 (1983), U.S. Code Cong. & Admin News 1984, pp. 3182, 3437 by eliminating sentencing disparities caused by classifying drugs as narcotic and nonnarcotic. *Id*. at 256. <u>Penalties were based instead upon the weight of the pure drug involved</u>." *Chapman v. United States*, 500 U.S. 453, 460-461 (1991) (emphasis added).

[7] Pub. L. No. 99-570, § 1002, 100 Stat. 3207-2 (1986).

[8] The 1986 amendments added new §§ 841(b)(1)(A) and 841(b)(1)(B). Each section covered the same limited number of controlled substances, but in differing threshold amounts. Meeting the § 841(b)(1)(A) thresholds produced for a first offense conviction a maximum life sentence and a minimum mandatory 10 year sentence. Meeting only the § 841(b)(1)(B) thresholds produced for a first offense conviction a 40 year maximum sentence and a minimum mandatory 5 year sentence. Under a new § 841(b)(1)(C), there was a 20 year maximum sentence, but no minimum mandatory sentence, for first offense convictions for the distribution of any Schedule I

4

quantities were measured, not by the weight of the pure controlled substance involved, but by the weight of the mixture containing a "detectable" amount of the controlled substance without regard for the percentage of the actual substance within the mixture.[10]

These two sets of amendments, except to the extent the latter set required the imposition of a minimum mandatory sentence, did not affect a court's broad sentencing discretion, but simply increased the range within which the court could exercise that discretion.  For example, the 1984 amendments raised the maximum quantity dependent penalties under § 841(b)(1)(A) for first offense convictions to twenty years while the 1986 amendments set a ten year minimum mandatory floor and a life maximum for such convictions.  The fact that there was a significant increase in the range within which a court could exercise its sentencing discretion did not necessarily require proportional increases in the sentences actually imposed.  The Sentencing Guidelines, however, performed that task.

The Sentencing Reform Act of 1984 established the United States Sentencing Commission and with detailed instructions charged the Commission

---

or II controlled substance in any amount, excepting marijuana, and except to the extent otherwise covered in §§ 841(b)(1)(A) or 841(b)(1)(B).  A re-designated § 841(b)(1)(D)  covered marijuana related controlled substances in quantities not covered in §§ 841(b)(1)(A) or 841(b)(1)(B) and Schedule III controlled substances with maximum penalties for first offense convictions limited to 5 years. Pub. L. No. 99-570, Title I, §§ 1002 and 1003, 100 Stat. 3207-2-3207-5 (1986).

[9]  The exception was phencyclidine (PCP). The 1986 amendment, Pub. L. No. 99-570, 100 Stat. 3207-2, as codified at 21 U.S.C. § 841(b)(1)(A)(iv), attached a minimum mandatory 10 year sentence and a life term maximum to "100 grams or more of phencyclidine (PCP) or 1 kilogram or more of a mixture or substance containing a detectable amount of phencyclidine (PCP)."  This was the only Schedule I or II controlled substance with a § 841(b) statutory quantity dimension based at least in part on drug purity in the 1986 amending legislation.  In the Anti-Drug Abuse Amendments Act of 1988, Pub. L. No. 100-690, Title VI, §§ 6470(g) and 6470(h), 102 Stat. 4371 (1988), § 841(b) was amended by adding subparagraphs § 841(b)(1)(A)(viii) and § 841(b)(1)(B)(viii) to provide methamphetamine with similar "purity" treatment.  PCP and methamphetamine remain the only two controlled substances with § 841(b) statutory penalties based, at least in part, on "purity" calculations.

[10]  Pub. L. No. 99-570, 100 Stat. 3207-2 -3207-4 (1986).

with developing and implementing Sentencing Guidelines for federal criminal offenses.[11] The resulting Guidelines went into effect on November 1, 1987 and thus shortly after Congress had substantially raised the maximum penalty ranges for drug offenses. One of the principal purposes of the Guidelines was to confine judicial sentencing discretion in order to diminish unwarranted sentence disparities.[12] To this end the Guidelines restrictively channeled sentencing discretion into a series of mandatory and progressively increasing ranges within the statutory limits. Since the statutory limits for drug offenses were expanded so drastically in 1986, and parole eliminated when the Guidelines went into effect, the guidelines that spanned the new statutory limits produced draconian sentencing ranges.

From the active inception of the Guidelines in 1987 and until 2005, Guideline conforming sentences were mandatory.[13] However, in *United States v. Booker*, 543 U.S. 220, 244 (2005), the Supreme Court ruled that a mandatory

---

[11] The Sentencing Reform Act of 1984, Pub. L. No. 98-473, Title II, ch. II, 98 Stat. 1987 is part of the Comprehensive Crime Control Act of 1984, Pub. L. No. 98-473, Title II, 98 Stat. 1976. The provisions of the Sentencing Reform Act establishing the Sentencing Commission as a continuing body and charging the Commission to develop and periodically to review and revise the Sentencing Guidelines, Pub. L. No. 98-473, Title II, ch. II, § 217(a) 98 Stat. 2017-2026, are codified, as amended, at 28 U.S.C. §§ 991-998 (2012). The Sentencing Guidelines had an extensive development history. *See* Kate Stith and Steve K. Yoh, *The Politics of Sentencing Reform: The Legislative History of the Federal Sentencing Guidelines*, 28 Wake Forest L. Rev. 223 (1993). For a description of the drafting process resulting in the original Guidelines, *see* Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1 (1988).

[12] *See* S. Rep. No, 225, 98th Cong., 2d Sess. 38, reprinted in 1984 U.S. Code Cong. & Admin. News 3182, 3221 (noting the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"). *See also* 18 U.S.C. § 3553(a)(6).

[13] "The transfer of formal sentencing authority from federal judges to the Sentencing Commission is probably the most significant development in judging in the federal judicial system since the adoption in 1938 of the Federal Rules of Civil Procedure. The new regime replaces the long-standing tradition that afforded judges broad discretion to determine criminal sentences within statutory limits. Despite the use of the term *guidelines*, the sentencing rules issued by the Sentencing Commission are binding on the federal judiciary." *Id*. at 2.

Guideline sentence on judicial fact finding violated Sixth Amendment jury trial rights.[14] The Guidelines survived by excision of the statutory provisions that had rendered them mandatory. The Guidelines were thereby preserved as "advisory,"[15] with appellate "reasonableness" review of advisory Guideline sentences.[16]

In the "advisory" Guidelines period since *Booker*, and in amendments to the Guidelines during the period, there has been a progressive movement toward more lenient drug sentences.  For example, currently, in both the House (H.R. 3713) and in the Senate (S. 2123), there are pending bipartisan Sentencing Reform bills designed to reduce the periods and the circumstances requiring the imposition of minimum mandatory sentences.

Advisory Guideline Sentencing Parameters *Post-Booker*

---

[14]  "Any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." *United States v. Booker*, 543 U.S. 220, 244, (2005).

[15]  "We answer the question of remedy by finding the provision of the federal sentencing statute that makes the Guidelines mandatory, 18 U.S.C. § 3553(b)(1) (Supp. IV), incompatible with today's constitutional holding.  We conclude that this provision must be severed and excised, as must one other statutory section, 3742(e) (2000 ed. and Supp. IV), which depends on the Guidelines' mandatory nature.  So modified, the federal sentencing statute, . . . , makes the Guidelines effectively advisory.  It requires a sentencing court to consider Guidelines ranges, see 18 U.S.C.A. § 3553(a)(4) (Supp. 2004), but it permits the court to tailor the sentence in light of other statutory concerns as well." *United States v. Booker*, 543 U.S. 220, 245 (2005).

[16] *Id.* at 261-263.  The "reasonableness" of a sentence is measured against the broadly stated factors set forth in 18 U.S.C. § 3553(a) with an ultimate goal of imposing a sentence "sufficient but not greater than necessary" to reflect the seriousness of the offense, to afford adequate deterrence, to protect the public from further crime of the defendant, and to provide a defendant with needed training, medical care, or other correctional treatment.  *See* 18 U.S.C. § 3553(a)(1) and (2).  *See also*, *Rita v. United States*, 551 U.S. 338, 341, 351 (2007); *Gall v. United States*, 552 U.S. 38, 49-51 (2007); *Kimbrough v. United States*, 552 U.S. 85. 91 (2007) ("A district judge must include the Guidelines range in the array of factors warranting consideration. The judge may determine, however, that, in the particular case, a within-Guidelines sentence is 'greater than necessary' to serve the objectives of sentencing. 18 U.S.C. § 3553(a) (2000 ed. and Supp. V)").

In the period prior to *Booker,*[17] mandatory guidelines significantly constrained the court's sentencing discretion and the 18 U.S.C. § 3552(a) factors were restricted to the court's exercise of the limited discretion the guidelines permitted.  *Booker*, however, made the § 3553(a) factors far more significant.

> Our post-*Booker* opinions make clear that, although a sentencing court must "give respectful consideration to the Guidelines, *Booker* permits the court to tailor the sentence in light of other statutory concerns as well." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (internal quotation marks and citation omitted).  Accordingly, although the "Guidelines should be the starting point and the initial benchmark," district courts may impose sentences within statutory limits based on appropriate consideration of all of the factors listed in § 3553(a), subject to appellate review for "reasonableness."

*Pepper v. United States*, 131 S.Ct. 1229, 1241 (2011).

Calculating the Applicable Guidelines

(1)  The Enhancement Under USSG §2D1.1(b)(1) Is Unwarranted.

As already noted, the PSR includes a two offense level enhancement pursuant to USSG §2D1.1(b)(1) for Diaz's alleged possession of a "switch blade style knife" when he was arrested following a transaction with co-defendant Jones.  Diaz objected to this two level enhancement.  The item possessed is improperly described as a "switch blade style knife."  It was a tool, namely a utility knife, which his step father purchased at Home Depot for Diaz's use in assisting him in installing alarm systems in cars.  See PSR ¶ 167.

USSG § 2D1.1(b)(1) will increase an offense level two levels for the possession of a "dangerous weapon."  Application Note 11(A) to USSG §2D1.1 refers to the definition of a "dangerous weapon" as set forth in the Commentary to USSG §1B1.1. Application Note 1(D) to USSG §1B1.1 defines a "dangerous

---

[17] *United States v. Booker*, 543 U.S. 220 (2005).

weapon" broadly to include any instrument "capable of inflicting death or serious bodily injury." As such, the definition includes virtually any item used to pound or pierce and would thus cover a myriad of tools found in hardware stores or at the dinner table and commonly used in daily activities. Diaz possessed a knife like tool which he used to strip wiring when he worked with his step father installing car alarm systems. Although the item fits within the broad definition given "dangerous weapon," it was possessed as a tool, not as a weapon. Moreover, Application Note 11 to USSG §2D1.1 indicates that the enhancement should not be applied if it is clearly improbable that the weapon was connected with the offense. The example used in the Note is the presence of a hunting rifle in the residence of a person arrested. The item Diaz had in his possession had nothing to do with his transaction with David Jones or his conspiracy offense of conviction.[18]

2. A Downward Departure to Criminal History Category V Is Warranted.

The Probation Office has determined that Diaz's criminal history results in a total of 18 criminal history points thus placing him in criminal history category VI. See PSR ¶¶ 127 and 128. Diaz does not contest the technical accuracy of this calculation but suggests that a downward departure is warranted pursuant to USSG §4A1.3(b). Six of Diaz's criminal history points are derived from four occasions of operating a motor vehicle without a license or with a suspended license. PSR ¶¶ 123 through 126. Under USSG §4A1.2 (c)(1) such offenses are not counted unless the sentences for the offenses are probation for more than one year or a term of imprisonment of at least thirty days. In other words, and somewhat oddly, criminal history points in these situations are driven not by the nature of the offense conduct

---

[18] Diaz's offense of conviction was conspiracy. Surely the enhancement is not designed to cover possession of any item that could cause serious bodily harm at any time during the conspiracy. The substantive crime transaction between Jones and Diaz, admittedly part of Diaz's relevant conduct under USSG § 1B1.3, was a transaction between co-conspirators and thus Diaz's possession of the utility knife is not reasonably connected to that substantive offense.

but by the sentence imposed. Unfortunately for Diaz, in each of the PSR ¶¶ 123 through 126 instances the probationary or imprisonment sentences were imposed thus qualifying him for six additional criminal history points.   If these criminal history points were not counted, Diaz's total criminal history points would be 12 and would place him in criminal history category V.

<u>A Booker Variance is Appropriate</u>

"Federal sentencing law requires the district judge in every case to impose 'a sentence sufficient, but not greater than necessary, to comply with' the purposes of federal sentencing, in light of the Guidelines and other § 3553(a) factors. 18 U.S.C. § 3553(a). The Guidelines provide a framework or starting point—a basis, in the commonsense meaning of the term—for the judge's exercise of discretion." *Freeman v. United States*. 131 S.Ct. 2685, 2692 (2011).   The sentencing decision must, in fact, start with a calculation of the applicable guidelines, *see United States v. Rodriguez*, 630 F.3d 39, 41 (1st Cir. 2010), but, given the post-*Booker* advisory nature of the guidelines, and the primacy of the § 3553(a) factors, a guideline sentence is not necessarily the appropriate sentence, i.e. the sentence sufficient but not greater than necessary, to comply with the purposes of federal sentencing. *See United States v. Jimenez-Beltre*, 440 F.3d 514, 518 (1st Cir. 2006)("Yet the guidelines are still *generalizations* that can point to outcomes that may appear unreasonable to sentencing judges in particular cases.").

Diaz's base offense level, level 24, is derived from a cocaine base quantity involved in his offense and attributable to him.  After reductions for acceptance of responsibility, his total offense level would be level 21. Had his offense involved an equivalent quantity of cocaine powder rather than cocaine base, his base offense level would have been level 12 and his total offense level 10.[19]  Under the Drug

---

[19]  For base offense level less than 16, USSG §3E1.1 limits the offense level reduction to two levels.

Quantity Table, the sentencing ranges for total offense level 21 in criminal history categories V and VI begin, respectively, at 70 and 77 months imprisonment.  The sentencing ranges in the two criminal history categories at total offense level 10 begin, respectively, at 21 and 24 months imprisonment.  Similarly, a comparable quantity of heroin, after reductions for acceptance of responsibility, would produce a total offense level 15 and respective sentencing range commencements in the two criminal history categories at 37 and 41 months imprisonment.  Although relatively recently the guideline sentencing disparities between cocaine powder and cocaine base offenses, as well as the disparities with other controlled substance offenses, have been reduced substantially, the disparities remains far more significant than warranted.

As reflected in Diaz's PSR at ¶¶ 157 and 158, Diaz has been diagnosed with bipolar disorder.  Although he denies some of the symptoms of bipolar disorder, it is likely that his mental condition exacerbate his criminal tendencies.  A sentence within the proposed plea agreement range, 48 to 57 months, is a significant sentence and certainly sufficient but not greater than necessary, to comply with the purposes of federal sentencing.

By his attorney,

/s/  Michael J. Liston
_____
Michael J. Liston BBO# 301760
25 Mt. Vernon Street
Cambridge, Massachusetts  02140
(857) 259-6040
michaeljliston@gmail.com

Dated:  March 13, 2016

## CERTIFICATE OF SERVICE

I, Michael J. Liston, do hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants identified on the Notice of Electronic Filing (NEF) and that paper copies will be sent to those indicated as non-registered participants on this date, March 13, 2016.

/s/ Michael J. Liston

_____